# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CIVIL ACTION NO.: 5:04CV117

| | |
|---|---|
| JOSEPH E. ELLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | ORDER |
| ) | |
| YADKIN VALLEY BANK & TRUST ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on the following Motions and Memoranda: (1) Defendant's Motion to Dismiss and Memorandum of Law in Support of Motion to Dismiss, both filed October 4, 2004 (Documents ## 4, 5); (2) Plaintiff's Motion to Remand and Brief in Support of Motion to Remand, both filed November 17, 2004 (Documents ## 10, 11); (3) Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss, filed November 17, 2004 (Document # 12); (4) Defendant's "Reply in Support of Motion to Dismiss and Response Opposing Motion to Remand," filed December 21, 2004 (Document # 15); (5) Plaintiff's Reply Brief in Support of Motion to Remand, filed January 7, 2005; and (6) "Defendant's Suggestion of Subsequently Decided Authority in Support of its Motion to Dismiss and Response Opposing Remand," filed March 8, 2006. These Motions are now ripe for disposition by the Court.

Having carefully considered the arguments, the record, and the applicable authority, for the below-stated reasons the Court will <u>grant</u> Plaintiff's Motion to Remand and <u>deny</u> Defendant's Motion to Dismiss.

# I. FACTUAL AND PROCEDURAL HISTORY

For purposes of the Motion to Dismiss, the Court accepts the following facts derived from the Plaintiff's Complaint as true. *See Darcangelo v. Verizon Communications, Inc.*, 292 F.3d 181, 189 (4th Cir. 2002) (stating that "at the motion to dismiss stage, a court must accept the allegations of the complaint as true and view the complaint in the light most favorable to the plaintiff").

On May 1, 2001, Plaintiff Joseph E. Eller ("Plaintiff" or "Eller") entered into an Employment Agreement (the "Agreement") with High Country Bank ("HCB"). Pursuant to the Agreement, HCB employed Eller as Senior Vice President. In addition to other terms, the Agreement contained a severance provision, which provides as follows:

> [Upon a termination without Cause by the Bank following a Change in Control, as set forth in Paragraph 7(g) of this Agreement,] the Officer shall be entitled at his election:
> (A) to continue to receive his Base Salary and bonuses as provided in this Agreement for a period of three and ninety-nine and one hundreths [sic] (3.99) years subsequent to the effective date of such termination; and
> (B) to continue to participate in all Benefit Plans and Fringe Benefits, except qualified retirement plans or [sic] for the period of three and ninety-nine one hundreths [sic] (3.99) years.
> Upon written notice by the Officer of the Bank, in lieu of paying the amount in item (A) above for a period of three and ninety-nine one hundredths (3.99) years in installments, the Officer shall be paid the Present Value of such Base Salary and bonuses in a lump sum within sixty (60) days of the termination of his employment. . . . In the event Officer elects such lump sum payment, the Officer shall continue to participate in the Benefit Plans and Fringe Benefits for the aforesaid three and ninety-nine one hundredths (3.99) year period. The Officer shall also be entitled to a cash payment of an amount equal to the amount of any and all excise tax liability incurred by Officer pursuant to Section 4999 of the Internal Revenue Code of 1986, as amended, in connection with the payments and benefits compensation in the [sic] Paragraph 7 (such amount to be determined by the Auditor at the Bank's expense).

(Compl. Exh. A ¶ 7(f)).

Pursuant to the Agreement, this severance provision is applicable under the following circumstances:

> Upon ten (10) days prior written notice, the Officer [Eller] may declare this Agreement to have been terminated without Cause by the Bank, upon the occurrence of any of the following events, which have not been consented to in advance by the Officer in writing, following a Change in Control, approved in advance by a formal resolution of at least two-thirds (2/3) of the Independent Directors: . . . (iii) if in the Officer's sole discretion, his responsibilities or authority in the capacity described in Paragraph 1 have been diminished materially.
> Upon such termination . . . the Officer shall be entitled to receive the compensation and benefit continuation when and as provided in Paragraph 7(f) above.

(Comp. Exh. A ¶ 7(g)). Furthermore, the term "Change in Control" is defined as:

> a change in control of the Bank of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities and Exchange Act of 1934, as amended, or the acquisition of control, within the meaning of Section 2(a)(2) of the Bank Holding Act of 1956, as amended, or Section 602 of the Change in Control Act of 1978, of the Bank by any Person. . . .

(*Id.* ¶ 7(h)).

On January 1, 2004, Defendant Yadkin Valley Bank and Trust Company ("Defendant" or "Yadkin Bank") acquired High Country Financial Corporation ("High Country"). High Country was the corporate parent of HCB. Therefore, by acquiring High Country, Defendant also acquired HCB. Consequently, effective January 1, 2004, Eller became an employee of Defendant. Significantly, the Agreement provides that it "shall inure to the benefit of and be finding [sic] upon any corporate or other successor of the Bank, including any Person who shall acquire, directly or indirectly, by merger, share exchange, purchase or otherwise, all or substantially all of the capital stock or assets of the Bank." (*Id.* ¶ 9(a)). Thus, upon Defendant's

3

acquisition of High Country and HCB, the Agreement became binding upon Defendant.

Defendant's acquisition of High Country and HCB constituted an "Approved Change in Control" as defined by Paragraph 7(g) of the Agreement. As a result of the Change in Control, Eller believed that his responsibilities and authority as Senior Vice President were materially diminished. Although Eller retained his title of Senior Vice President, he no longer had the same responsibilities, authority, or prestige as he had while employed by HCB. Consequently, on May 3, 2004, which was within one year of the Change in Control, Eller gave Defendant ten days written notice of his declaration that he had been terminated without cause pursuant to Paragraph 7(g) of the Agreement. Eller's last day of employment with Defendant was May 25, 2004.

Despite Eller's declaration, Defendant took the position that even though it acquired High Country and HCB, Eller experienced no material diminution in his responsibilities and authority. Accordingly, Defendant refused to pay the severance benefits or allow Eller to participate in the Benefit Plans as provided in Paragraphs 7(g) and 7(f) of the Agreement.

On August 3, 2004, Eller filed the instant lawsuit in the North Carolina Superior Court of Watauga County, asserting claims for: (1) breach of contract; (2) violation of North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1, *et seq.*; and (3) declaratory judgment on the enforceability of the covenant not to compete contained in the Agreement. On September 1, 2004, Defendant removed the action to this Court, claiming that Eller's claims were completely preempted by provisions of the Employee Retirement Security Act of 1974 ("ERISA").

## II. DISCUSSION

**A.     Motion to Remand**

Federal district courts are courts of limited jurisdiction. *Owen Equip. & Erection Co. v.*

4

*Kroger*, 437 U.S. 365 (1978). The limits upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded. *Id.* Thus, the existence of subject matter jurisdiction is a threshold issue, and absent a proper basis for subject matter jurisdiction, a case must be remanded to state court. *See Steele Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) (stating that "[w]ithout jurisdiction, courts cannot proceed at all in any cause; jurisdiction is power to declare law, and when it ceases to exist, the only function remaining to court is that of announcing the fact and dismissing the cause").

Removal of an action is governed by 28 U.S.C. § 1441. Subdivision (a) of the statute authorizes removal only of cases that originally might have been brought in federal court. "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Id.* (citing *Gully v. First Nat'l Bank*, 299 U.S. 109, 112-13 (1936)). Consequently, the plaintiff is the master of his complaint as he may avoid federal jurisdiction by exclusive reliance on state law. *Id.*

The burden of demonstrating proper jurisdiction rests with the party seeking removal. *Sonoco Prods. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 370 (4th Cir. 2003). Moreover, the courts "narrowly interpret removal jurisdiction because the removal of proceedings from state courts raises 'significant federalism concerns.'" *Sonoco*, 338 F.3d at 370 (quoting *Mulcahey v. Columbia Organic Chems. Co., Inc.*, 29 F.3d 148, 151 (4th Cir. 1994)).

1. **Doctrine of complete preemption**

Despite the weight given to the "well-pleaded complaint rule," there is an independent corollary to this rule known as the complete preemption doctrine. *Caterpillar, Inc. v. Williams*,

5

482 U.S. 386, 392 (1987); *see also Childers v. Chesapeake & Potomac Tel. Co.*, 881 F.2d 1259, 1261 (4th Cir. 1989) (noting that the doctrine of "complete preemption" is an exception to the well-pleaded complaint rule). Where "'Congress so completely preempt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character,' the state law claims are converted into federal claims, which may be removed to federal court." *Sonoco*, 338 F.3d at 371 (quoting *Darcangelo v. Verizon Communications, Inc.*, 292 F.3d 181, 186 (4th Cir. 2002)); *see also Caterpillar*, 482 U.S. at 393 (stating that "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law"). The touchstone of complete preemption is whether Congress intended the federal cause of action to be the exclusive cause of action for the type of claim brought by a plaintiff. *King*, 337 F.3d at 425 (citing *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1 (2003)).

The Employee Retirement Security Act of 1974 ("ERISA") is one of the few federal statutes that completely preempts state law. *King*, 337 F.3d at 425; *see also* 29 U.S.C. § 1144 (stating that ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. . ."). Any state law claim that comes within the scope of ERISA's civil enforcement provision is completely preempted and, thus, removable to federal court.[1] *Id.* However, in order for ERISA's civil enforcement provision to be relevant in the first

---

[1] The portion of ERISA's civil enforcement provision relevant to the instant case provides, in pertinent part, as follows: "A civil action may be brought (1) by a participant or beneficiary . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. . . ." 29 U.S.C. § 1132(a)(1)(B).

6

place, there must be an employee welfare plan, as defined by ERISA, that forms the basis for the dispute between the parties. *See* 29 U.S.C. § 1144(a). Without an ERISA plan, there is no complete preemption of a plaintiff's state law claims. In such an event, a federal court lacks subject matter jurisdiction and a motion for remand must be granted.

### 2. Defining "employee benefit plan" for purposes of ERISA preemption

"ERISA was passed by Congress in 1974 to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits." *Massachusetts v. Morash*, 490 U.S. 107, 112, 109 S.Ct. 1668, 1671, 104 L.Ed.2d 98 (1989). To that end, ERISA created extensive reporting, disclosure, and fiduciary duty requirements to "insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator." *Id.* at 115.

As noted above, ERISA governs an employee welfare benefit plan, which is defined as "any plan, fund, or program which was . . . established by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants," *inter alia*, severance benefits. 29 U.S.C. § 1002(1)(B); *Donovan v. Branch Banking & Trust Co.*, 220 F. Supp. 2d 560, 564 (S.D. W. Va. 2002). Significantly, not every agreement that provides for the payment of severance benefits constitutes an "employee welfare benefit plan" as defined by ERISA. *Donovan*, 220 F. Supp. 2d at 564. "ERISA was intended to provide 'for the federal regulation of *plans*, not merely *benefits*.'" *Id.* (quoting *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 934 (8th Cir. 1999)) (emphasis in original).

Since the text of ERISA provides little assistance in determining the existence of a "plan," case law controls whether a benefit program falls within the category of an ERISA plan.

*Id.* The Fourth Circuit has not developed a specific framework for determining the existence of an ERISA benefit plan. *Id.* Consequently, this Court must look to the analytical framework provided by the Supreme Court and other jurisdictions. *Id.*

### a. Fort Halifax *test*

The Supreme Court created the seminal framework for determining whether an employer's "plan" falls within the confines of ERISA. *See Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1 (1987). In *Fort Halifax*, the Court found that a Maine statute, which required employers who closed or relocated their plant to provide a one-time, lump-sum severance payment to each terminated or displaced employee, was not a "plan" that would be preempted by ERISA. *Id.* at 6. In so holding, the Supreme Court noted that ERISA's preemption provision resulted from a recognition that employers that establish and maintain employee benefit plans are faced with coordinating complex administrative activities. *Id.* at 11. Consequently, a "patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits. . . ." *Id.* "Pre-emption ensures that the administrative practices of a benefit plan will be governed by only a single set of regulations." *Id.* (citing H.R. Rep. No. 93-533, p. 12 (1973), U.S. Code Cong. & Admin. News 1974, pp. 4639, 4650). The Court noted, however, that "[t]his concern only arises . . . with respect to benefits whose provisions by nature requires an *ongoing administrative program* to meet the employer's obligation." *Id*. (emphasis added). With regard to the Maine statute specifically at issue in *Fort Halifax*, the Court found:

> [t]he employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the

8

> occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. . . . The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

*Id.* at 12.

In sum, the Supreme Court found that an employment agreement establishes a "plan" pursuant to ERISA if the benefits provided require an "ongoing administrative program to meet the employer's obligation." *Id.* at 11.

### b. *Interpretations and applications of* Fort Halifax

Although the Supreme Court provided a general framework for determining whether an ERISA plan exists, the *Fort Halifax* Court did not establish a specific test to make such determination. However from the background of *Fort Halifax* and the numerous federal circuit court cases that have flowed from it, a test has emerged to determine whether a plan is covered by ERISA: does the alleged "plan" require the creation or establishment of a new, separate, ongoing administrative scheme. *See Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 257 (8th Cir. 1994) (stating that "[t]he pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits"); *James v. Fleet/Norstar Fin. Group, Inc.*, 992 F.2d 463, 467 (2nd Cir. 1993) (stating that "the nature of the payments did not require an ongoing administrative employer program to effectuate them"); *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1539 (3rd Cir. 1992) (finding that the buyout plan did not implicate ERISA because it "did not require the creation of a new administrative scheme, and did not materially alter an existing administrative scheme"); *Fontenot v. NL Indus., Inc.*, 953

F.2d 960 (5th Cir. 1992) (finding that agreement at issue did not require the creation of an administrative scheme). This same test has been applied by federal district courts. *See Donovan v. Branch Banking & Trust Co.*, 220 F. Supp. 2d 560, 566 (S.D. W. Va. 2002) (stating that the agreement did not require "an ongoing administrative process"); *Williamson v. GTE Prods. Corp.*, 955 F. Supp. 364, 373 (M.D. Pa. 1997) (concluding that agreement was not a "plan" within the meaning of ERISA as no new administrative scheme came into being and no new responsibility was added to the existing administrative scheme); *Middleton v. Philadelphia Elec. Co.*, 850 F. Supp. 348, 352-54 (E.D. Pa. 1994) (stating that agreement at issue did not require the "establishment and maintenance of a separate and ongoing administrative scheme").

In determining whether an agreement constitutes an ERISA plan, a court must look at all of the terms in context. However, the courts use various factors in conducting this analysis, including: (1) whether the employer is given discretion under the severance agreement, as opposed to the terms of the agreement automatically occurring upon a specified event; and (2) whether benefits are provided on a regularly occurring basis, in contrast to a payment that occurs on a single occasion. *Donovan*, 220 F. Supp. 2d at 564-65 (citing *Emmenegger*, 197 F.3d at 934-35); *D'Oliviera v. Rare Hospitality Int'l, Inc.*, 150 F. Supp. 2d 346, 351 (D.R.I. 2001); *Gilmore v. Silgan Plastics Corp.*, 917 F. Supp. 685, 688 (E.D. Mo. 1996); *Blair v. Young Phillips Corp.*, 158 F. Supp. 2d 654, 659 (M.D.N.C. 2001). Although courts consider various factors, "[t]he degree of employer discretion a severance agreement permits is perhaps the most significant factor in deciding whether a contract or statute providing benefits requires an ongoing administrative scheme." *Blair*, 158 F. Supp. 2d at 659 (citing *Champagne v. Revco D.S., Inc.*, 997 F. Supp. 220, 222 (D.R.I. 1998)).

### c. *Application of the* **Fort Halifax** *analysis to the case at bar*

In the instant case, if Eller qualified to receive a severance, pursuant to the Agreement he would receive: (1) a lump sum equal to the present value of 3.99 years of his base salary and bonuses; (2) a cash payment equal to the amount of any excise tax liability incurred by Eller pursuant to Section 4999 of the Internal Revenue Code that results from the lump sum payment of his salary and bonuses; and (3) continued participation in all Benefit Plans (except qualified retirement plans) and Fringe Benefits for a period of 3.99 years.

### i. **Employer discretion**

Defendant argues that the calculation procedure provided in the Agreement constitutes "ongoing administrative responsibilities" sufficient to create an ERISA plan. (Def. Reply in Supp. of Mot. to Dismiss and Resp. Opposing Mot. to Remand p. 4-5). The Court is not persuaded. Generally, in order for a calculation mechanism under a severance agreement to constitute an "ongoing administrative responsibility," there needs to be some discretion on the part of the employer to determine the amount of benefits or the method by which the benefits are calculated. *See, e.g., DeLaye v. Agripac, Inc.*, 39 F.3d 235, 237 (9th Cir. 1994) (finding severance agreement that provided for payments at a fixed monthly amount for twelve to twenty-four months according to a set formula, plus accrued vacation pay and insurance benefits did not rise to the level of an ongoing administrative scheme because there was "nothing discretionary about the timing, amount or form of payment"); *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1996) (finding agreement did not constitute a "plan" under ERISA because "[t]he level of discretion, if any, which [defendant] was required to exercise in

implementing the agreement was slight"); *see contra Bogue v. Ampex Corp.*, 976 F.2d 1319, 1321 (9th Cir. 1992), *cert. denied*, 507 U.S. 1031, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993) (concluding ERISA plan did exist where criterion had to be applied on a case-by-case basis, the program, by its own terms, required discretionary decision-making, and the plan could not be managed without an administrative scheme for dealing with claims of entitlement to the promised benefits).

In the instant case, the Agreement, and specifically Paragraphs 7(f) and 7(g), give great detail on what payments will be provided, the form of those payments, and the methodology for determining the amount of payments. Specifically, upon an "Approved Change of Control," Eller may receive a single lump-sum payment, which must be made within sixty (60) days of the date of Eller's termination. Significantly, the Agreement characterizes the payment as a "lump sum" and provides a specific method for calculating this amount. *See Donovan*, 220 F. Supp. 2d at 565 (finding significant that the payment was titled a "lump-sum cash amount" and noting that since simple, mathematical calculations control the amount of the payment, there was no ongoing administrative scheme). Defendant is given no discretion to determine the amount or method of calculation of this lump sum payment. In contrast to an ongoing administrative scheme, the Agreement requires only the simple mechanical task of following the calculation procedure outlined in the Agreement.[2] *See Kulinski*, 21 F.3d at 258 (referring to the "simple mechanical

---

[2]Paragraph 7(f) of the Agreement provides, in pertinent part, as follows:

> The calculation of the amount due shall be made by the independent accounting firm then performing the Bank's independent audit (the "Auditor") at the expense of the Bank. If Officer does not agree with the calculation performed by the Auditor, then Officer may choose an auditor to perform such calculation on his

task" of calculating benefits upon the employee invoking the appropriate severance provision).

Consequently, the Court concludes that there is nothing discretionary on the part of Defendant regarding the timing, amount or form of payment. Rather, once Eller resigned his employment for what he regarded as a good reason, the Agreement provided no option to Defendant other than to provide the benefits to Eller. (Compl. Exh. A ¶ 7(g)). Such lack of discretion weighs heavily in favor of finding that Paragraphs 7(f) and 7(g) of the Agreement do not constitute an ERISA plan. *See Kulinski*, 21 F.3d at 258 (finding no ERISA plan where the agreement provided that "once a hostile takeover occurred and [plaintiff] resigned his employment for what he regarded as a good reason, there was nothing for the company to decide, no discretion for it to exercise, and nothing for it to do but write a check").

        ii.       **Frequency of provision of benefits**

As noted above, the severance benefits provided under the Agreement fall primarily into two categories: (1) a lump sum payment, which includes compensation for excise tax liability incurred by Eller due to the severance payment; and (2) continued participation in Defendant's Benefit Plans.

The lump sum payment to Eller under the Agreement falls squarely within the *Fort Halifax* framework. This provision of the Agreement requires a "one time, lump-sum payment

---

    behalf and at his expense. Following such calculation, if the Auditor and the auditor appointed by the Officer are unable to agree on the calculation, the Bank and the Officer shall agree on an independent third-party auditor who shall be appointed to determine the calculation of the amount due to Officer pursuant to this paragraph. The determination of such third-party auditor shall be conclusive and binding on all parties herein.

triggered by a single event," which requires no administrative scheme whatsoever to meet Defendant's obligation. *Fort Halifax*, 482 U.S. at 12. Therefore, this lump sum payment does not turn the Agreement into an ERISA plan.

With regard to the provision continuing Defendant's benefits, Defendant contends that the Agreement is a "plan" under ERISA because it permits Eller to continue to participate in Defendant's Benefit Plans and Fringe Benefits for three and ninety-nine one hundredths (3.99) years. (Def. Reply in Supp. of Mot. to Dismiss and Resp. Opp. Mot. to Remand, pp. 5-7). Defendant argues that such continuation of benefits constitutes an ongoing administrative scheme. (*Id.*). Attaching unauthenticated and fragmented documents to its Response, Defendant argues that Eller and his dependents are disqualified from participation in the Benefit Plans and if the provision of the Agreement were enforced, Defendant would be required to create self-funded plans or purchase new plans for Eller. (*Id.* pp. 6-7). Defendant maintains that such creation of a plan would create a new, separate, and ongoing scheme of benefits which is the "hallmark" of an ERISA plan. (*Id.* p. 7).

The Court is unpersuaded.[3] Numerous courts have found that the continuation of benefits

---

[3] Although Defendant argues that the benefit plans are incorporated into the Complaint and, thus, the Court can properly consider the documents attached to its Response to Plaintiff's Motion to Remand without converting the Rule 12(b)(6) motion into a Rule 56 motion, the Court notes that it may only consider documents that are not attached to the complaint where such documents are "integral to and explicitly relied on in the complaint and [where] the plaintiffs do not challenge [their] authenticity." *Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). The Court here finds that the documents attached to Defendant's Response are not integral to or explicitly relied on in the Complaint and, therefore, this Court will not rely on these documents.

for a period of years as part of a severance agreement is insufficient to create an ERISA plan. *See Angst,* 969 F.2d at 1538-39 (finding that a year of continued benefits did not require the creation of a new administrative scheme and did not materially alter the existing administrative scheme); *Fontenot*, 953 F.2d at 961, 963 (concluding that agreement that provided for continuation of benefits for three years after termination did not constitute an ERISA plan); *Donovan*, 220 F. Supp. 2d at 565-66 (stating that continuation of benefits for one year after termination did not create an ERISA plan as there was "nothing discretionary about the timing, amount or form of these benefits").

The Court notes that the cases cited by Defendant for the proposition that continuation of medical benefits constitutes an ERISA plan are easily distinguishable from the case at bar. *See DeBoard v. Sunshine Mining & Refining Co.*, 208 F.3d 1228, 1233 (10th Cir. 2000) (noting that agreement provided for continuing health care dependent on specific circumstances that continued even past an employee's death); *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1409-10 (6th Cir. 1996) (summarily determining agreement constituted ERISA plan where terms included (1) substantial severance payment; (2) professional re-employment assistance; (3) continuation of medical (excluding dental/vision) and life insurance coverages for up to one year; and (4) requirement "grow-in" provisions); and *Champagne v. Revco D.S., Inc.*, 997 F. Supp. 220, 223 (D.R.I. 1998) (noting that the agreement provided for "severance pay to be made in a lump sum according to a schedule based on years of employment, some continued benefit programs during the severance period, . . . an offer of outplacement services to assist those displaced in obtaining employment, [and stating] that 'certain benefits thereafter may be extended through Cobra provisions, which the human resources department will explain to each affected associate'").

15

Here, in contrast to the agreements in the cases cited by Defendant, the Agreement at issue provides for the continuation of existing benefits for a specified period of years. No discretion is given to Defendant with regard to timing or payment of those benefits.

The Court recognizes that the decision of whether the continuation of benefits constitutes an ERISA plan cannot be made in a vacuum. Rather, the Court must look at the entire Agreement and its context, rather than one isolated factor. The discretion given to the employer, as well as the nature and extent of an employer's obligations under a severance plan are all necessary factors to consider in deciding whether an agreement falls within the confines of an ERISA plan. The Court concludes that Paragraphs 7(f) and 7(g) of the Agreement do not require the creation of a new, separate and ongoing administrative scheme. Consequently, the severance provisions within these Paragraphs do not constitute a "plan" within the meaning of ERISA.

### d.     *Confidentiality and covenant not to compete provisions*

In addition to the severance provision, Paragraph 5 of the Agreement contains a confidentiality and non-competition provision, which provides in pertinent part as follows:

> (b)  Non-competition.  In consideration of employment of the Officer, during the Term and any subsequent Payment Period (as defined below), the Officer agrees that he will not, within the North Carolina counties in which the Bank has banking offices during the Term (the "Market"), directly or indirectly, own, manage, operate, join, control or participate in the management, operation or control of, or be employed by or connected in any manner with, any Person who Competes with the Bank, without the prior written consent of the Board; provided, however, that the provisions of this Paragraph 5(b) shall not apply prospectively in the event this Agreement is terminated by the Bank without Cause (as defined below). . . .
>
> (c)  Remedies for Breaches. . . . In the event of the Officer's actual or threatened breach of the covenants contained in Paragraphs 5(a) or 5(b), the Bank shall be entitled to bring a civil action seeking an injunction restraining the Officer from

> breaching or continuing to breach those covenants or from any threatened breach thereof, or any other legal or equitable relief relating to the breach of such covenants. . . .

(Compl. Exh. A ¶ 5).

Defendant contends that since it must monitor Eller's compliance with the confidentiality and non-competition provisions contained in Paragraph 5, such monitoring requires an ongoing administrative scheme and, therefore, the Agreement is an ERISA plan. (Def. Reply in Supp. of Mot. to Dismiss and Resp. Opp. Mot. to Remand, pp. 2-4). The Court disagrees with Defendant.

Notably, no provision in the Agreement provides for the forfeiture or cessation of the severance benefits listed in Paragraphs 7(f) and 7(g) in the event that Eller breaches either the non-competition or the confidentiality provisions. In fact, as noted above, the provision regarding noncompetition clearly provides that "the provisions of this Paragraph 5(b) shall not apply prospectively in the event this Agreement is terminated by the Bank without Cause (as defined below). . . . (Compl. Exh. A ¶ 5(b)). Moreover, the Agreement itself provides remedies for breach of the confidentiality and noncompetition provisions. (*Id.* ¶ 5(c)). Specifically, "[i]n the event of the Officer's actual or threatened breach of the covenants contained in Paragraphs 5(a) or 5(b), the Bank shall be entitled to bring a civil action seeking an injunction restraining the Officer from breaching or continuing to breach those covenants or from any threatened breach thereof, or any other legal or equitable relief relating to the breach of such covenants." (*Id.*). Since the Agreement does not provide for the forfeiture or cessation of the severance benefits as a remedy for a violation of Paragraphs 5(a) or 5(b), no monitoring of Eller is needed to determine whether he is eligible for severance benefits under Paragraphs 7(f) and 7(g). Rather, once Eller is

eligible for benefits, even if he breaches the terms of Paragraph 5, Defendant is not entitled to recover or rescind the severance benefits. Instead, Defendant's remedies are listed in Paragraph 5(c). The Court finds that in light of the fact that receipt and retainer of severance benefits is not contingent on Eller's compliance with the non-competition and confidentiality provisions, the Agreement does not require an ongoing administrative scheme so as to convert the Agreement into an ERISA plan. *See e.g., O'Connor v. Commonwealth Gas Co.*, 251 F.3d 262 (1st Cir. 2001) (finding agreement that gave employees a severance bonus, pension credit, payment for COBRA premiums, and reimbursement for educational assistance and outplacement services in exchange for the employee foregoing their annual bonus and signing releases, confidentiality and non-competition agreements did not constitute an ERISA plan); *see contra Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 567 (2nd Cir. 1998) (finding the existence of an ongoing administrative scheme where agreement specifically provided that the defendant was not obligated to continue to provide benefits if the employee receiving such benefits "fails to comply with any Company Covenant Against Disclosure" or "becomes employed by any business competitive with the Company").

### 3. In the Absence of ERISA Preemption, There Is No Federal Jurisdiction

In conclusion, the Court finds that Paragraphs 7(f) and 7(g) of the Agreement do not require an ongoing administrative scheme and, therefore, the Agreement does not fall within the confines of an ERISA "plan." Without an ERISA plan, there is no complete preemption of Eller's state law claims. Without complete preemption of Eller's state law claims, there is no basis for federal question jurisdiction under 29 U.S.C. § 1331 and this Court lacks subject matter jurisdiction over the instant lawsuit. Consequently, removal to this Court was improper and the

case must be remanded to the General Court of Justice for the State of North Carolina, Watauga County, Superior Court Division. Therefore, the Court grants Plaintiff's Motion to Remand.

**B.     Motion to Dismiss**

Since the Court concluded that the severance provisions in the Agreement do not constitute a "plan" as defined by ERISA and remanded this matter to the General Court of Justice for the State of North Carolina, Watauga County, Superior Court Division, the Court denies Defendant's Motion to Dismiss.

**C.     Attorneys' Fees and Costs Due to Improper Removal**

"An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). As noted by the statutory language, the decision of whether to award attorney's fees and costs under this provision is within the Court's discretion.

Plaintiff asks the Court to award attorney's fees and costs due to Defendant's improper removal of this action. Plaintiff contends that even a cursory examination of the pertinent cases established lack of federal jurisdiction in this case.

The Court finds in the instant case that there is no good cause for awarding attorney's fees and costs to Plaintiff incurred as a result of bringing the Motion to Remand. Therefore, Plaintiff's request for an award of attorney's fees and costs is denied.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Remand is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that this matter be remanded to the General Court of

Justice for the State of North Carolina, Watauga County, Superior Court Division.

**IT IS FURTHER ORDERED** that the Clerk of Court provide a certified copy of this Order to counsel for Plaintiff. Counsel for Plaintiff is directed to file the certified copy with the Clerk of Court for Watauga County immediately.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss is hereby **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's request for an award of attorney's fees and costs is hereby **DENIED**.

Signed: August 3, 2006

Richard L. Voorhees
United States District Judge